# UNITED STATES DISTRICT COURT
### FOR THE
## DISTRICT OF COLUMBIA

SOUTHERN CHRISTIAN LEADERSHIP
CONFERENCE,

                 Plaintiffs,

v.

CLARANCE M. KELLEY, *et al.*,

                 Defendants.

Case No.: 76-1186

## PLAINTIFFS' RESPONSE IN OPPOSITION TO THE
## <u>UNITED STATES' MOTION TO UNSEAL TAPES AND DOCUMENTS</u>

(Oral Argument Requested)

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................i

INTRODUCTION .....................................................................................................1

BACKGROUND ........................................................................................................2

ARGUMENT .............................................................................................................6

    I.   There is No Legal Basis for the Government's Request to Unseal the MLK Files. ...............................................................................................................6

    II.  The Sealed Files Exceed the Scope of the Executive Order. ...........................7

    III. Unsealing the MLK Files is Contrary to SCLC's, the King Family's, and the Public's Interest. ..........................................................................................10

        A.   The MLK Files contain attorney-client privileged information, which SCLC has a strong interest in preserving. .................................................11

        B.   The King family opposes the premature unsealing of the MLK Files. .... 12

        C.   The MLK Files cannot be likened to government records in which the public has an interest. .............................................................................14

        D.   The MLK Files are inherently unreliable. .............................................15

CONCLUSION........................................................................................................18

**INTRODUCTION**

Nearly fifty years ago, Plaintiff Southern Christian Leadership Conference ("SCLC") brought this action to vindicate the Federal Bureau of Investigation's ("FBI") gross violations of its federal constitutional and statutory rights. Over a period of at least five years, from 1963 through 1968, the FBI illegally surveilled Reverend Dr. Martin Luther King, Jr. ("Dr. King"), the president and founder of SCLC, as well as numerous SCLC members and those they interacted with—at SCLC's offices, in places of public accommodation, and at Dr. King's home. At the conclusion of the litigation, this Court entered an order sealing wiretap recordings, transcripts, and logs generated as a result of this illegal surveillance for a period of fifty years. That order still has full legal effect.

The Government seeks to unseal these records. *See* Doc. 2. It does so without legal justification, which is alone reason for this Court to deny the extraordinary request. But even the purported factual bases on which the Government relies do not withstand scrutiny. The Government invokes a recently issued executive order that directs the federal government to release documents related to the assassination of Dr. King. But whether in the form of an executive order or other directive, the President lacks the authority to compel the disclosure of any assassination records that are under a court-ordered seal, and the sealed files—which are the result of illegal incursions on SCLC's privacy interests—are much more expansive in scope than those pertaining to Dr. King's assassination. In addition, the Government's

recent mishandling of similar sensitive files casts doubt on whether it would handle these sensitive documents with the care they require.

The Government also contends that the public interest, and the interests of the King family, weigh in favor of unsealing. SCLC has a countervailing interest in maintaining the records under seal, though: They almost certainly contain privileged communications between SCLC officers and their legal counsel. Critically—and contrary to the Government's suggestion—Dr. King's living family members, who have devoted their lives to carrying on the legacy of Dr. King's work with SCLC, oppose this premature request to unseal. Also, the sealed files, which consist of covert recordings of private citizens, cannot be likened to public records that the public has an interest in accessing. Finally, the sealed files are highly unreliable insofar as they purport to paint a picture of Dr. King's work with SCLC and releasing them would undermine the public's trust in the government.

The Court should deny the Government's legally unsupported request.[1]

## BACKGROUND

Dr. King is one of the most important figures in the history of the United States. His contributions to the civil rights struggles of the 1950s and 1960s transformed our nation and gave hope to countless advocates of freedom and equity across the globe. During the majority of his public life, and at all times relevant to

---

[1] Under Local Rule 7(f), SCLC requests a hearing on this motion.

this case, Dr. King served as SCLC's president.[2] In 1957, Dr. King convened 115 civil rights leaders from the South to embark on SCLC's mission to "redeem[] the soul of America" through nonviolent protest challenging racial segregation in America.[3] Until Dr. King was assassinated on April 4, 1968, SCLC provided the foundation for his civil rights activism. SCLC's role in and contributions to the civil rights movement during Dr. King's life are synonymous with those of Dr. King.

During Dr. King's life—and during the height of the civil rights movement for Black freedom and self-determination—the federal government vilified and demonized Dr. King, along with other Black civil rights leaders. The FBI attempted to accomplish the goal of discrediting Dr. King and SCLC through its now-infamous counterintelligence program ("COINTELPRO").[4] The surveillance involved illegally wiretapping Dr. King's home, SCLC offices, and hotel rooms in which he and other SCLC members convened.[5] Under COINTELPRO, the FBI labeled SCLC a "Black Nationalist–Hate Group[]," and identified Dr. King as a Black leader who posed a threat because he was on a trajectory to become a "messiah" who could "unify and

---

[2] *Southern Christian Leadership Conference (SCLC)*, THE MARTIN LUTHER KING, JR. RSCH. & EDUC. INST., https://kinginstitute.stanford.edu/southern-christian-leadership-conference-sclc (last visited Apr. 3, 2025).

[3] *Id.*

[4] *See* S. SELECT COMM. TO STUDY GOVERNMENTAL OPERATIONS WITH RESPECT TO INTEL. ACTIVITIES, *Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans,* S. REP. NO. 94-755 bk. III at 179 (1976).

[5] *See Federal Bureau of Investigation (FBI),* THE MARTIN LUTHER KING, JR. RSCH. & EDUC. INST., https://kinginstitute.stanford.edu/federal-bureau-investigation-fbi (last visited Apr. 3, 2025); *see also* Jan. 31, 1977 Order at 4 (specifying SCLC's offices, Dr. King's home, and places of public accommodation as locations of the FBI's wiretapping).

electrify the militant black nationalist movement."[6] J. Edgar Hoover, the FBI Director at the time, repeatedly indicated his disdain for Dr. King and led a government-sponsored effort to discredit his character.[7] In short, the overt goal of the FBI's surveillance was to undermine the work and dilute the impact of Dr. King and SCLC.[8]

After learning of the FBI's role in covertly surveilling SCLC's activities, in 1976, SCLC and Bernard Lee, who served as Dr. King's executive assistant at SCLC, filed this action against the FBI Director and individual FBI agents (the "FBI Defendants") challenging the legality of the FBI's actions. *See* Doc. 2-1, Plaintiff Lee's Am. Compl. & Doc. 2-2, Plaintiff SCLC's Am. Compl. They sought money damages to compensate them for the violations of their First Amendment and Due Process rights, as well as an order requiring the destruction or impoundment of the surveillance files. Plaintiff Lee's Am. Compl. at 4–5; Plaintiff SCLC's Am. Compl. at 5.

Ultimately, in January 1977, this Court entered an order dismissing SCLC's and Mr. Lee's damages claims against the FBI Defendants, concluding that they were barred by the statute of limitations. Doc. 2-3, Jan. 31, 1977 Order, at 2. Simultaneously, the Court ordered that the surveillance records be "turned over, under seal, to the Archivist of the United States." *Id.* at 3. Specifically, it directed the FBI to gather "all known copies of the recorded tapes, and transcripts thereof, resulting from the FBI's microphonic surveillance, between 1963 and 1968, of

---

[6] S. REP. NO. 94-755 bk. III at 179–180.
[7] *See* S. REP. NO. 94-755 bk. III at 140–143, 154.
[8] *See id.* at 140–143, 154, 179–180.

[SCLC's] former president, Martin Luther King, Jr.; and all known copies of the tapes, transcripts and logs resulting from the FBI's telephone wiretapping, between 1963 and 1968, of [SCLC's] offices in Atlanta, Georgia and New York, New York, the home of Martin Luther King, Jr., and places of public accommodation occupied by Martin Luther King, Jr." (the "MLK Files"). *Id.* at 3–4. The Court required the FBI to deliver "under seal an inventory of said tapes and documents" to the Court and to "deliver said tapes and documents to the custody of the National Archives and Records Service, to be maintained by the Archivist of the United States under seal for a period of fifty (50) years." *Id.* at 4.

The files were delivered to the National Archives in batches, with the final delivery occurring on October 26, 1977.[9] *See* Ex. 1, *SCLC v. Kelley* Docket Sheet ("1976 Dkt."), at 4 (on Aug. 5, 1977, "ORDER granting motion of Kelley for enlargement of time to 10-26-77 within which to comply with this Court order of 1-31-77."); *id.* (FBI Defendants' notice to court that the sealed files were delivered to the National Archives on Oct. 26, 1977). Based on this Court's order, the MLK Files are to remain under seal until October 26, 2027—approximately two and a half years from now. Despite this, the Government has filed a legally baseless motion to prematurely lift the seal, relying on the supposed need to facilitate compliance with a recently issued executive order relating only to the assassination of Dr. King, and

---

[9] The FBI Defendants twice moved for an extension of time to compile and deliver the MLK Files. *See* 1976 Dkt. at 4 (docket entries reflecting a motion for, first, an additional 90 days to comply with the Court order (on April 21, 1977) and, second, for an enlargement of time (on July 28, 1977)). The Court granted both motions and ultimately extended the deadline until October 26, 1977. *Id.*

on inaccurate representations concerning the interests of the King family and the public. *See* Doc. 2, Mot. to Unseal.

## ARGUMENT

The Court should deny the Government's motion for three reasons: (1) there is no legal basis for the Government's request to prematurely unseal the MLK Files; (2) the records at issue are beyond the scope of the executive order upon which the Government relies; and (3) unsealing the MLK Files is contrary to the interests of SCLC, the King family, and the public.

### I.    There is No Legal Basis for the Government's Request to Unseal the MLK Files.

The Government provides no legal justification for its extraordinary request to undo this Court's order sealing the MLK Files. That is because none exists.

In this Circuit, motions to unseal records are ordinarily evaluated under a six-part test that considers "the interests advanced by the parties in light of the public interest and the duty of the courts." *In re Leopold to Unseal Certain Elec. Surveillance Applications & Ords.*, 964 F.3d 1121, 1131 (D.C. Cir. 2020) (citation omitted); *see also United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980). But as the Government correctly acknowledges in its motion, Doc. 2 at 3 n.1, that test does not apply here because the MLK Files do not constitute "judicial records." This is because the MLK Files do not appear to have been entered into the record in this case, and regardless, they were not "intended to influence" the Court, nor did the Court "make decisions about them." *In re Leopold*, 964 F.3d at 1128 (cleaned up).

The Government did not identify any other framework that would govern a request to undo a binding judicial order more than 48 years after it was entered, nor has SCLC been able to find one.[10] Seemingly recognizing that it seeks extraordinary relief without legal basis, the Government makes a cursory reference to "good cause," Doc. 2 at 1, but it does not identify a single government interest that would justify the early unsealing of the MLK Files, legitimate, compelling, or otherwise. Rather, it arbitrarily contends that the Court should unseal the MLK files simply because "the records have remained shielded from the public for long enough." *Id.* at 4. That is no legal standard, and it is not a compelling reason to undo this Court's order. The Court should deny the Government's motion for the mere fact that there is no legal authority that justifies its request.

## II.     The Sealed Files Exceed the Scope of the Executive Order.

In addition to the lack of legal authority for the Government's extraordinary request, the purported rationale for unsealing the records—to assist the Attorney General in her compliance with Executive Order 14,176 ("Executive Order"), *see* Doc. 2 at 3—crumbles under scrutiny. The Executive Order directs "the release of information pertaining to the assassination[]" of Dr. King. Exec. Order No. 14,176, 90 Fed. Reg. 8641 (Jan. 23, 2025). Though there are multiple indications that the MLK Files cover a lot more territory than Dr. King's assassination, the Government seeks

---

[10] The Government's motion is about 48 years too late to be considered a motion for reconsideration under the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 59(e) (motions to alter or amend the judgment must be filed no later than 28 days after the entry of judgment); *see also* Fed. R. Civ. P. 60 (providing narrow grounds for relief from a judgment or order, none of which apply here).

an order unsealing them in their entirety with no indication of whether and how it would limit public disclosure to files germane to that question.

The MLK Files comprise "all known copies of the recorded tapes, and transcripts thereof, resulting from the FBI's microphonic surveillance, between 1963 and 1968, of the [SCLC]'s former president, Martin Luther King, Jr.; and all known copies of the tapes, transcripts and logs resulting from the FBI's telephone wire-tapping, between 1963 and 1968, of the [SCLC]'s offices in Atlanta, Georgia and New York, New York, the home of Martin Luther King, Jr., and places of public accommodation occupied by Martin Luther King, Jr." Jan. 31, 1977 Order at 4. Based on the Court's own description of the sealed files, as well as their historical underpinnings, it is highly likely that the scope of the MLK Files is much broader than information pertaining to Dr. King's assassination, if they contain such information at all. Specifically, the MLK Files extend only until an unspecified date in 1968, *see id.*—the same year Dr. King was assassinated. But the FBI did not begin its investigation into Dr. King's murder until at least late in the evening of April 4, 1968,[11] suggesting that the files preceding that date may be minimally relevant to the assassination. *See also* Ex. 2, Declaration by Martin Luther King III ("Martin Luther King III Decl."), ¶ 6 ("These surveillance recordings of our home in Atlanta have nothing to do with our father's murder in Memphis, hundreds of miles away.

---

[11] *King's Assassination: A Timeline*, PUBLIC BROADCASTING SERVICE (PBS), https://www.pbs.org/wgbh/americanexperience/features/memphis-hunt/ (last visited Apr. 3, 2025).

They will shed no light on the assassination that is the subject of the President's executive order.").

The Government's assertion that the MLK Files should be unsealed "so that the Attorney General may review them, identify any records about the assassination of the Reverend King, and release those records in compliance with the President's executive order," Doc. 2 at 3, provides no measure of comfort. The Government's mishandling of the release of former President John F. Kennedy's assassination file, in accordance with the same Executive Order, is instructive.[12] In acting upon the order, the Government released information not only related to the assassination, but also extraneous and highly sensitive matters involving national security as well as the Social Security numbers and personally identifiable information relating to hundreds of people.[13] The assassination files that were released did not meaningfully alter the pre-existing understanding of the events surrounding President Kennedy's assassination either,[14] even though that was the express purpose of the Executive Order, *see* 90 Fed. Reg. at 8641 ("to finally release all records *related to the assassinations* . . . ." (emphasis added)).

---

[12] *See* Sarah Maslin Nir & Maggie Haberman, *White House Seeks to Contain Damage from Personal Data in Kennedy Files*, N.Y. TIMES (Mar. 20, 2025), https://www.nytimes.com/2025/03/20/us/jfk-assassination-files-personal-information.html.

[13] *Id.*

[14] Joe Edwards, *Newly Unredacted JFK Assassination Files Spark Renewed Debate, But Do They Change the Story?*, DALL. EXPRESS, (Mar. 21, 2025), https://dallasexpress.com/national/the-new-jfk-files-what-are-the-updates-so-far/.

The Government's mishandling of the records relating to President Kennedy's assassination underscores the need for the Court to maintain the seal on the MLK Files. This is doubly true because there is no legal basis for the Government's request to unseal the MLK Files, whereas the President John F. Kennedy Assassination Records Collection Act of 1992 authorizes the release of President Kennedy's assassination records. *See* 90 Fed. Reg. at 8641 (discussing 44 U.S.C. § 2107).

## III. Unsealing the MLK Files is Contrary to SCLC's, the King Family's, and the Public's Interest.

The Government further attempts to justify its request by vaguely invoking the "public interest in understanding the truth about the assassination of the Reverend King," Doc. 2 at 1, including that "the King family and the American public 'deserve transparency and the truth' about what occurred," *id.* at 3–4 (citing Executive Order). But the Government overlooks an overriding interest: The MLK Files likely include attorney-client privileged information, which SCLC has a strong interest in preserving. The Government also inaccurately represents the King family's interests: Dr. King's living family members do not want the MLK Files to be unsealed, and they have previously undertaken their own efforts to seek closure around their father's assassination. The public interest does not weigh in favor of unsealing, either. The MLK Files, which consist entirely of the unlawful surveillance of private citizens, cannot be likened to governmental records the public has an interest in accessing. And the MLK Files are the result of the FBI's covert surveillance of Dr. King and SCLC with the specific intention of maligning Dr. King's reputation as his influence over the American public grew. The inherently tainted

nature of the surveillance cuts against any suggestion that the files will lead to greater transparency.

> ### A. The MLK Files contain attorney-client privileged information, which SCLC has a strong interest in preserving.

It is highly likely that the MLK Files capture communications between SCLC officers, including Dr. King, and their attorneys.[15] The MLK Files include surveillance from SCLC's headquarters, hotel rooms, and other sites of their organizing.[16] And attorneys for SCLC defended Dr. King, SCLC, and protesters, often meeting them in those very locations.[17] Worse, still, the FBI wiretapped the phone lines of specific attorneys who advised Dr. King, including during the relevant time period.[18]

SCLC has a strong interest in maintaining these communications under seal, as they constitute attorney-client privileged communications "deemed worthy of maximum legal protection." *In re Pub. Def. Serv.*, 831 A.2d 890, 900 (D.C. 2003)

---

[15] *See* Leonard S. Rubinowitz et al., *A "Notorious Litigant" and "Frequenter of Jails": Martin Luther King, Jr., His Lawyers, and the Legal System*, 10 Nw. J. L. & Soc. Pol'y 494 (2016), http://scholarlycommons.law.northwestern.edu/njlsp/vol10/iss3/1 (discussing the various attorneys who represented Dr. King and SCLC and their relationships with both throughout the course of Dr. King's public life, inclusive of the period of FBI surveillance).

[16] *Federal Bureau of Investigation (FBI),* The Martin Luther King, Jr. Rsch. & Educ. Inst., https://kinginstitute.stanford.edu/federal-bureau-investigation-fbi (last visited Apr. 3, 2025).

[17] *See* Rubuinowitz et al., *supra* note 15, at 621–623 (appendix providing various examples of lawyers engaging Dr. King and SCLC throughout the country).

[18] *See* S. Rep. No. 94-755 bk. III at 340 ("In [1962], the office telephone of an advisor to Dr. Martin Luther King, Jr.—also a lawyer—was wiretapped and his office was bugged; his telephone was wiretapped again in 1963. A second attorney who advised Dr. King was wiretapped in 1963[.]") (footnotes omitted).

(citation omitted). Despite the age of the MLK Files, the attorney-client privilege endures as it "is perpetual, and does not cease with the termination of the suit, nor is it affected by the party ceasing to employ the attorney and retaining another, nor by any other change of relation between them, nor by the death of the client; the seal of the law once fixed upon them *remains forever*." *Oliver v. Cameron*, MacArth. & M. 237, 244, 11 D.C. 237, 244 (1880).

Conversely, the Government has not identified a countervailing interest, let alone one strong enough to overcome the attorney-client privilege.

### B. The King family opposes the premature unsealing of the MLK Files.

In its motion, the Government twice invokes the "King family['s]" right to know the truth about Dr. King's assassination as a reason the seal should be prematurely lifted. Doc. 2 at 3–4. The Executive Order, too, asserts that justification. 90 Fed. Reg. at 8641. But that contention is inaccurate. In fact, Dr. King's surviving children oppose the Government's request.

"The release of the sealed files will be traumatic for [the King] family." Martin Luther King III Decl. ¶ 11. The King family "respectfully disagree that the public release of the sealed records is a benefit for our family." *Id.* ¶ 7; *see also* Ex. 3, Declaration of Dr. Bernice A. King ("Dr. Bernice King Decl."), ¶ 12 ("While . . . the government has stated in their motion that unsealing these files would be good for my family, I wholeheartedly disagree."). They "believe it would be a disservice to the public to release these records divorced from the context necessary to understand them properly," and "whatever incremental historical value they have is outweighed

by the harm their public release will cause to [the King] family and to the families of others illicitly surveilled." Martin Luther King III Decl. ¶ 10.

Likewise, Dr. Bernice King believes that "that the Records should remain sealed as originally ordered." Dr. Bernice King Decl. ¶ 9. It is her "hope that the files should be permanently sealed or destroyed, due to the illegal incursion and invasion of [her] father's privacy and their unreliability resulting from the untrustworthy actions of the FBI and its Director, J. Edgar Hoover during the civil rights movement of the 1950-60's." *Id.* ¶ 10. She has "no desire for these files to be unsealed and made public, which would cause the matter of the unfair surveillance and treatment of [her] father and his assassination to be addressed and rehashed once again." *Id.* ¶ 12.

The Government's argument also ignores the reality that the King family previously pursued its own quest for the truth about Dr. King's assassination through a wrongful death lawsuit—which resulted in a jury verdict concluding that Lloyd Jowers and other unidentified co-conspirators, including government agencies, were responsible.[19] Dr. King's surviving family members "hoped the findings of [their] civil wrongful death trial in 1999 would be a cathartic close to the examination of this history altering event." Dr. Bernice King Decl. ¶ 12; *see also* Martin Luther King III Decl. ¶ 5. It is not up to the Government to decide for the King family whether to hold

---

[19] Kevin Sack & Emily Yellin, *Dr. King's Slaying Finally Draws a Jury Verdict, but to Little Effect*, N.Y. TIMES (Dec. 10, 1999), https://www.nytimes.com/1999/12/10/us/dr-king-s-slaying-finally-draws-a-jury-verdict-but-to-little-effect.html  ("Dr. King's widow and children exulted today in the verdict, saying it vindicated their nearly three-year effort to revive the investigation into his killing.").

onto any finality afforded to them by the jury verdict or to reopen old wounds and revisit the circumstances of Dr. King's assassination.

### C. The MLK Files cannot be likened to government records in which the public has an interest.

The Government improperly assumes that the public has an implicit right to review the MLK Files, likening them to public records. It argues that "the records have remained shielded from the public for long enough" and that "[f]ifty years is on the high end of how long sensitive documents usually are kept secret." Doc. 2 at 4–5; *see also id.* at 3 (noting that the Executive Order also ordered the declassification of records about the assassinations of former President John F. Kennedy and Senator Robert F. Kennedy).

The MLK Files cannot be reasonably held to the same standard as the other examples of "sensitive documents" the government invokes, as the surveillance tapes of private citizens do not remotely resemble "presidential records, . . . predecisional deliberative documents, . . . or national security information." *See* Doc. 2 at 5. Likewise, the public does not have the same interest in the MLK Files as it does in the contents of files related to the assassination of a former president or senator. Dr. King's prominence as a high-profile figure does not eclipse the fact that he, and those whom he worked with at SCLC, remained private citizens. *See* Martin Luther King III Decl. ¶ 7 ("We also disagree that our family and the general public stand on equal footing with respect to illicit recordings made of our family home."); Dr. Bernice King Decl. ¶ 11 (explaining that it would be a "travesty of justice" "to have the purported

surveillance files made public," because "[her] father was a private citizen, not an elected official, who enjoyed the right to privacy.").

### D. The MLK Files are inherently unreliable.

The motives behind the FBI's surveillance of Dr. King and SCLC—to vilify and discredit them—cut against any notion that the release of the files will result in increased transparency around Dr. King's assassination.

Indeed, the FBI was unabashed in its attempts to undermine Dr. King during the period of surveillance, seeking to alter public opinion and discourage people from working with him. The FBI produced a report called "Communism and the Negro Movement—A Current Analysis," which was sent to various high-ranking government officials.[20] An assistant attorney general later described it as a "personal diatribe . . . a personal attack without evidentiary support on the character, the moral character and person of Dr. Martin Luther King, and it was only peripherally related to anything substantive."[21] A December 23, 1963 FBI memo said, "[A]t the proper time when it can be done without embarrassment to the Bureau, [the FBI will] expose King as an opportunist who is not a sincere person but is exploiting the racial situation for personal gain."[22] In 1964, an FBI official contacted the General Secretary of the National Council of Churches of Christ to share the FBI's beliefs about Dr. King, to which the General Secretary responded, "steps have been taken by

---

[20] S. Rep. No. 94-755 at 131–132, 481.

[21] *Id.* (quoting testimony of Burke Marshall, Former Assistant Att'y Gen., C.R. Div., U.S. Dep't of Just.).

[22] *Id.* at 134 (quoting Memorandum from William Sullivan to Alan Belmont (Dec. 24, 1963)).

the National Council of the Churches of Christ to make certain from this time on that Martin Luther King will never get 'one single dollar' of financial support from the National Council,"[23] suggesting that the FBI maligned Dr. King in these communications. After learning of Dr. King's attempt to publish an article with a major national publication in September 1964, the FBI communicated with the publication which, in turn, assured the FBI that it would "endeavor to assist" the FBI, and made certain editorial decisions that cast Dr. King in a negative light.[24] While Dr. King was in Europe to receive the Nobel Peace Prize in 1964, the FBI briefed American diplomats located in cities that Dr. King might visit, in order to further discredit King abroad.[25]

Specifically related to the FBI's surveillance of Dr. King, after the FBI installed the first two of what would later total at least 15 hidden microphones in Dr. King's hotel rooms, the FBI's Internal Security Section wrote that it was attempting to gather information about "the [private] activities of Dr. King and his associates" so that Dr. King could be "completely discredited."[26] While Dr. King was staying in Honolulu and Los Angeles, FBI Director J. Edgar Hoover sent a copy of a memorandum describing taped contents to Attorney General Robert Kennedy in order to: "remove all doubt from the Attorney General's mind as to the type of person

---

[23] *Id.* at 142 (quoting Memorandum from William Sullivan to Alan Belmont (Dec. 16, 1964)).

[24] *Id.* at 144 (quoting Memorandum to Catha DeLoach, (Nov. 3, 1964)); *see id.* at 145.

[25] *Id.* at 144.

[26] *Id.* at 120–121 (alteration in original) (quoting Memorandum from Frederick Baumgardner to William Sullivan (Jan. 28, 1964)).

King is. It will probably also eliminate King from any participation in [a memorial for President Kennedy which the Attorney General was helping to arrange]."[27] Another FBI memorandum, from July 1964, noted that "[w]e are continuing to follow closely King's activities and giving consideration to every possibility for future similar coverage that will add to our record on King so that in the end he might be discredited and thus be removed from his position of great stature in the Negro community."[28]

The FBI's vendetta against King did not end with his death. Upon learning that Congress was intending to make Dr. King's birthday a national holiday, the Crime Records Division of the FBI recommended briefing members of Congress on Dr. King because they were "in a position to keep the bill from being reported out of Committee if they realize King was a scoundrel."[29]

Given the corrupt motivations of the FBI's illegal surveillance of Dr. King, release of the files would not increase transparency around Dr. King's assassination, as the Government asserts. Indeed, "[s]ome, perhaps many, of the recordings may be fake." Martin Luther King III Decl. ¶ 8. The MLK Files "have never undergone the scrutiny of a digital forensic examination or a review to address the privacy concerns of those recorded, nor have any historical scholars had an opportunity to examine these files for their veracity, context, or authenticity." *Id.* ¶ 9; *see also* Dr. Bernice

---

[27] *Id.* at 122 (alteration in original) (quoting Memorandum from Frederick Baumgardner to William Sullivan (Mar. 4, 1964)).
[28] *Id.* at 122 (quoting Memorandum from Frederick Baumgardner to William Sullivan (July 15, 1964)).
[29] *Id.* at 183 (cleaned up) (quoting Memorandum from Milton Jones to Thomas Bishop (Mar. 18, 1969)).

King Decl. ¶ 10 (explaining that release of the MLK Files would "cause me and the remaining living members of my family and my father's legacy irreparable harm, due to the history of fabricated assertions and disinformation from Director Hoover and the Bureau, used as a disparagement campaign.").

## CONCLUSION

For these reasons, the Court should deny the Governments' Motion to Unseal Tapes and Documents.

Respectfully submitted this 3rd day of April, 2025.

 /s/ Sumayya Saleh
Edward G. Caspar, D.C. Bar No. 1644168
Sumayya Saleh, D.C. Bar No. 1743427
Olivia N. Sedwick, D.C. Bar No. 19006628
Chavis Jones, D.C. Bar No. 1739219
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
Phone: (202) 662-8600
ecaspar@lawyerscommittee.org
salehs@lawyerscommittee.org
osedwick@lawyerscommittee.org
cjones@lawyerscommittee.org

*Counsel for Southern Christian Leadership Conference*

18

## CERTIFICATE OF SERVICE

I certify that on April 3, 2025, I served a copy of the foregoing filing on counsel for the United States by filing it with the Clerk of the Court through the CM/ECF system, which will provide notice to all registered counsel of record.


Dated: April 3, 2025                   By: */s/ Sumayya Saleh*_____
                                             Sumayya Saleh